NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0140n.06

No. 24-1331

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

Mar 12, 2025

KELLY L. STEPHENS, Clerk

|  |  |
|---|---|
| OAKLAND FAMILY RESTAURANTS, INC; LAKE AREA RESTAURANTS, INC., )<br>        Plaintiffs-Appellants, )<br> )<br>v. )<br> )<br>AMERICAN DAIRY QUEEN CORPORATION, )<br>        Defendant-Appellee. ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN<br><br>OPINION |

Before: CLAY, GIBBONS, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Plaintiffs operate twelve Dairy Queen franchises and want to reward some longtime loyal employees by assigning franchise rights to them. When defendant American Dairy Queen Corporation conditioned its consent for that assignment on the new owners signing updated franchise agreements, plaintiffs sued for breach of contract and sought declaratory relief. The district court granted summary judgment in defendant's favor, and we affirm.

I.

In 1965, American Dairy Queen Corporation ("ADQ") granted rights to a franchisee to develop and operate Dairy Queen restaurants in Oakland County, Michigan, under a franchise agreement ("the 1965 Agreement"). Relevant to this appeal, the 1965 Agreement provided that the franchisee could not "assign this agreement . . . without first obtaining the written consent and approval of [ADQ]." For decades, different franchisees operated a single Dairy Queen store

according to the terms of the 1965 Agreement. The store changed ownership many times, and each time, ADQ consented to the sale and assignment of rights under the 1965 Agreement.

In 1996, then-owner Sanford Aronoff requested clarification concerning whether he could "sell the franchise for [his] current store, or the franchise for a store that [he] might develop" under the 1965 Agreement. ADQ responded that he could "sell either or both stores" and that the rights under the 1965 Agreement would accompany the sale of a store. It further clarified that if Aronoff wished to sell territory, he must also sell the corresponding store—he could not sell territory alone. And for any sale, ADQ would require Aronoff to attach an addendum to the 1965 Agreement "to clarify the territory that is attached to each store."

Around the same time, Aronoff met Nathan Hickling, another Michigan Dairy Queen franchise operator. The two discussed the possibility of opening new Dairy Queen locations in Aronoff's territory or transferring Aronoff's development rights to Hickling. Anticipating the business opportunity, Hickling and two business partners formed the two corporations that are plaintiffs here: Oakland Family Restaurants ("Oakland Family") and Lake Area Restaurants ("Lake Area").

In 1998, unbeknownst to ADQ, Aronoff and Oakland Family created the Southwest Oakland Development Partnership ("the Development Partnership") to develop Aronoff's untapped territory. When ADQ learned about the pending sale of a store in Aronoff's territory to Oakland Family, ADQ wrote:

> YOU MUST OBTAIN PRIOR WRITTEN CONSENT FROM AMERICAN
> DAIRY QUEEN CORPORATION (ADQ) TO ASSIGN ANY INTERESTS IN
> THE FRANCHISE AGREEMENT. WE RECOMMEND THAT YOU DO NOT
> COMPLETE ANY PURCHASE BEFORE BEING ASSURED BY ADQ IN
> WRITING THAT THE REQUIREMENTS FOR SUCH CONSENT TO
> ASSIGNMENT HAVE BEEN MET.

Aronoff and Oakland Family complied and sought ADQ's consent, which resulted in two addenda to the 1965 Agreement in 2000, dividing Aronoff's territory in two and transferring a portion to Oakland Family and a portion to the Development Partnership. Importantly, the addenda provided that Aronoff, Oakland Family, and the Development Partnership did not have any right to sell, lease, or assign the territory, "other than in connection with the sale or assignment of the franchise rights for an existing Dairy Queen® Store that [Aronoff], [Oakland Family], or [the Development Partnership] developed and operated in the Territory for a period of not less than six (6) months."

Also notable, the addenda affirmed that "the terms and conditions of the [1965] Franchise Agreement shall remain in full force and effect and shall be binding upon the parties as written." In a separate "Assignment and Consent to Assignment," Aronoff and Oakland Family acknowledged that they "understand that the assignment is not effective until consented to by American Dairy Queen Corporation." Aronoff and Lake Area signed the same acknowledgment in 2005, when Aronoff transferred the rest of his franchise interest. Since then, Oakland Family and Lake Area have owned all rights to the original 1965 Agreement and have opened other Dairy Queen stores in their territory. Today, they operate twelve stores.

Around 2020, in preparation for his retirement, Hickling began discussing selling some of Oakland Family's and Lake Area's Dairy Queen stores to three of his oldest employees. He emailed ADQ requesting approval to transfer the stores and divide the territory accordingly. ADQ responded that it would not allow the prospective franchisees to operate under the 1965 Agreement; they would have to sign a new Dairy Queen "Treat Operating Agreement." ADQ later explained that it had implemented a new company-wide transfer policy requiring all new franchisees to sign an updated agreement because it wanted to modernize its franchises to adapt to

the changed legal, technological, and competitive landscapes and to create brand consistency across all Dairy Queen locations.

Because ADQ refused to consent to the transfer of stores and territory without signing new franchise agreements, plaintiffs sued, asserting breach-of-contract and declaratory-judgment claims. They contend that the 1965 Agreement, as amended by the 1996 letter and the 2000 addenda, conditions the sale of a store or territory on only (1) plaintiffs' development of the store and (2) its operation for at least six months prior to the sale. On cross-motions for summary judgment, the district court determined that ADQ permissibly withheld consent because the consent-to-assignment provision from the 1965 Agreement was clear, unambiguous, and not modified or waived by the letters, addenda, or ADQ's conduct over the years. Accordingly, the district court granted summary judgment in ADQ's favor on the breach-of-contract claim. And because it determined that ADQ had "good cause" to withhold consent to assign the 1965 Agreement, the district court also denied plaintiffs' request for declaratory relief. Plaintiffs timely appealed.

II.

We review de novo a district court's resolution of cross-motions for summary judgment. *See Snyder v. Finley & Co.*, 37 F.4th 384, 387 (6th Cir. 2022). Summary judgment is appropriate if, "viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party," there is "no genuine issue as to any material fact" and the movant is entitled to judgment as a matter of law. *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d. 235, 241–242 (internal quotation marks omitted). A "genuine issue" exists "only when there is sufficient evidence on which the jury could reasonably find for the plaintiff." *Id.* at 242 (internal

quotation marks omitted).  The parties agree that Michigan contract law governs this dispute.  *See Gasperini v. Ctr. for Human., Inc.*, 518 U.S. 415, 427 (1996).

III.

A.

We must first determine the terms of the franchise agreement under which the parties operate.  ADQ seeks to enforce the terms of the 1965 Agreement's consent-to-assign provision, while plaintiffs contend that the parties waived that consent provision.

Under Michigan law, parties may freely assign contractual rights unless the contract clearly restricts assignment.  *Shah v. State Farm Mut. Auto. Ins.*, 920 N.W.2d 148, 158 (Mich. Ct. App. 2018).  No one disputes that the 1965 Agreement clearly and unambiguously restricts plaintiffs' assignment right by stating that they "will not . . . assign this agreement . . . without first obtaining the written consent and approval of [ADQ]."  *See id.* (describing a provision conditioning assignment on consent as "perfectly clear" and collecting Michigan cases enforcing unambiguous anti-assignment provisions).  And while "parties to a contract are free to mutually waive or modify their contract," such waiver or modification must be established "through clear and convincing evidence of a written agreement, oral agreement, or affirmative conduct establishing mutual agreement to modify or waive the particular original contract."  *Quality Prods. & Concepts Co. v. Nagel Precision, Inc*., 666 N.W.2d 251, 253–54 (Mich. 2003) (emphasis omitted).

Plaintiffs rely on ADQ's letters and the 2000 addenda, but these documents are not "clear and convincing evidence" of "mutual agreement to modify or waive" the 1965 Agreement's consent requirement.  *See id*.  We consider first the letters.[1]  The 1996 letter clarified that the

---

[1]ADQ argues that Michigan's parol-evidence rule bars consideration of the letters because the parties agree that the 1965 Agreement is unambiguous.  *See, e.g.*, *Salzman v. Maldaver*, 24 N.W.2d 161, 165 (Mich. 1946) ("It is well established that where a written contract is clear and

franchisee can only transfer rights associated with a store, not territorial rights alone. It did not retract or contradict the consent requirement in the 1965 Agreement. Indeed, the letter explained that the sale of a store would also encompass the assignment of the 1965 Agreement "as it pertains to that specific location of the store that you are selling." And plaintiffs concede that this letter "did not purport to amend the existing franchise agreement." Even Aronoff, the former franchise owner who wrote the questions to ADQ precipitating the 1996 letter, understood that the letter did not override the 1965 Agreement. He testified that, after receiving the letter, he believed the 1965 Agreement still required consent to sell or transfer. True to form, Aronoff requested ADQ's consent before he assigned his rights to Oakland Family and the Development Partnership in 2000. So even if the 1996 letter evidenced "mutual agreement" between Aronoff and ADQ with respect to the additional transfer requirements, neither party intended it to modify or waive the 1965 Agreement's consent requirement. *See id.* at 253, 257 ("[A] party alleging waiver or modification must establish a mutual intention of the parties to waive or modify the original contract.").

And the 1999 letter reinforced ADQ's intent to continue enforcing the 1965 Agreement's consent requirement—not its intent to waive it, as plaintiffs suggest. In that letter, ADQ wrote in all capital letters, "YOU MUST OBTAIN PRIOR WRITTEN CONSENT FROM AMERICAN DAIRY QUEEN CORPORATION (ADQ) TO ASSIGN ANY INTERESTS IN THE FRANCHISE AGREEMENT." ADQ's intent was clear.

---

unambiguous, parol evidence of prior negotiations and representations cannot be adduced to . . . vary the terms of the contract."). We need not make this parol-evidence determination because even if we consider the letters as plaintiffs argue we should, they support ADQ's position that the consent requirement was never waived or modified.

Moreover, the timing of the 1996 and 1999 letters belies plaintiffs' argument that the additional assignment requirements from the 2000 addenda—that territory must be sold along with a store and that a store must operate for at least six months—were "the subject of extensive negotiations and were considered by [plaintiffs'] shareholders to be an integral and key part of their initial franchise agreement with ADQ." That plaintiffs understood the letters to waive ADQ's consent requirement is of no moment because plaintiffs did not become franchisees until 2000 and 2005. Their post-hoc interpretation of ADQ's letters to Aronoff is not evidence of ADQ's intent to waive or modify the 1965 Agreement's consent-to-transfer provision. If plaintiffs believed that the letters somehow expanded their assignment rights when they took over the franchises in the 2000s, ADQ is not bound by that assumption. In sum, the letters do not contradict or waive the 1965 Agreement's consent requirement.

The same is true of the 2000 addenda, both of which affirm the 1965 Agreement's validity and application with their identical "Affirmation" clauses: "Except as specifically amended by this Addendum, the terms and conditions of the [1965] Franchise Agreement shall remain in full force and effect and shall be binding upon the parties as written." The addenda did not "specifically amend[]" the 1965 Agreement's consent-to-assign provision. Instead, the addenda provide that plaintiffs cannot "sell, lease, or assign any portion of the Territory other than in connection with the sale or assignment of the franchise rights for an existing Dairy Queen Store®" that Aronoff, Oakland Family, or the Development Partnership "developed and operated in the Territory for a period of not less than six (6) months." This provision further limits plaintiffs' assignment rights; it does not expand them. Indeed, the provision's title, "No Sale, Lease or Assignment of Territories," introduces a restriction, not an amendment, waiver, or expansion of the franchisees' right to sell. Read together, the 1965 Agreement and the 2000 addenda mean that

plaintiffs can sell the franchise rights, with ADQ's consent, for a store that they have been operating for at least six months.

Plaintiffs argue that this reading renders the limitations in the 2000 addenda superfluous because, under the 1965 Agreement, ADQ could withhold consent to assign franchise rights to territory unconnected to a store or one established for fewer than six months. But that misapplies the rule against surplusage. Contract provisions are not superfluous if they "serve some reasonable purpose." *Allstate Ins. v. Freeman*, 443 N.W.2d 734, 742 (Mich. 1989) (citation omitted). And here, the addenda clarified that ADQ would not consent to transfer unless a store had been established for at least six months. Moreover, "the rule of construction that [contracts] should be interpreted to give effect to every term is not needed, here, where the [contractual] language is clear." *W. Mich. Univ. Bd. of Control v. State*, 565 N.W.2d 828, 833 (Mich. 1997).

Because there is not "clear and convincing evidence" of an intent to modify or waive the consent requirement, we must enforce the terms of the contract as written. *Quality Prods.*, 666 N.W.2d at 257. The district court therefore correctly determined that under the unambiguous terms of the 1965 Agreement, ADQ had a right to withhold consent to plaintiffs' assignment of the franchise agreement.

## B.

Next, we analyze whether the 1965 Agreement's consent provision is enforceable. As the parties conceded—and as we explained—the 1965 Agreement unambiguously restricts plaintiffs' assignment right by requiring ADQ's consent to transfer the franchise agreement. Although Michigan courts enforce "unambiguous contracts" as written, *see Shah*, 920 N.W.2d at 157–58,

plaintiffs argue that the consent-to-assign provision in the 1965 Agreement is unenforceable under Michigan's Franchise Investment Law (MFIL).[2]  We disagree.

MFIL provides that a "provision which permits a franchisor to refuse to permit a transfer of ownership of a franchise" is "void and unenforceable," except for when the provision permits refusal "for good cause."  Mich. Comp. Laws § 445.1527(g) [hereinafter § 27(g)].  Section 27(g) then lists examples of good cause, such as if the proposed transferee does not meet the franchisor's reasonable qualification standards or if the proposed transferee is unwilling to comply with its lawful obligations.  *Id.* § 455.1527(g)(i–iv).  In plaintiffs' view, § 27(g)'s application to the 1965 Agreement imposes a good-cause limitation on ADQ's right to withhold consent to transfer.  In other words, it voids a franchise agreement's provision prohibiting the transfer of franchise ownership, unless the franchise agreement, by its terms, conditions withholding consent on good cause.

Plaintiffs point to *Franchise Management Unlimited, Inc. v. America's Favorite Chicken* for their assertion that § 27(g)'s good-cause exception applies only when the agreement itself limits an anti-assignment provision to good cause.  561 N.W.2d 123 (Mich. Ct. App. 1997).  There, the Michigan Court of Appeals upheld as "good cause" a franchisor's contractual requirement that a franchisee sign a release of claims before assigning the agreement, even though the provision did not explicitly require "good cause" for the franchisor's refusal to agree to the transfer.  *Id.* at 126–27.  The court determined that the franchisor had "good cause not to approve a transfer" because, at the time of the proposed transfer, the franchisee failed to cure a default in the franchise

---

[2]The district court appropriately avoided questions regarding the retroactive application of the 1974 MFIL to the 1965 Agreement by looking at the effect of the MFIL if applied to the 1965 Agreement.  In the interest of judicial restraint, we adopt the same approach and affirm on the same grounds.

agreement by failing to sign a release of claims. *Id*. at 127. And failure "to cure any default in the franchise agreement" is an example of good cause under § 27(g)(iv).

But § 27(g) does not impose such a stringent contract-drafting requirement—nor have the Michigan courts interpreted it to contain such a requirement. Rather, it requires the court to ask whether the franchisor had "good cause" "at the time of the proposed transfer" for enforcing a contractual restriction on a franchisee's right to transfer. *See id.* The 1965 Agreement conditions transfer of franchise ownership on ADQ's consent—just like the agreement in *Franchise Management Unlimited* conditioned transfer on the franchisee's signing of a release of claims. And just as the court there asked whether requiring a release of claims constituted good cause, we must ask whether requiring ADQ's consent constituted good cause "at the time of the proposed transfer." *See id.*

For these reasons, the district court appropriately concluded that § 27(g) does not render the 1965 Agreement's consent-to-assign provision unenforceable in this circumstance.[3]

C.

Last, we ask whether ADQ had "good cause" under the MFIL to condition transfer on proposed franchisees signing new agreements. It did. As the district court appropriately held, ADQ's condition that new franchisees sign an updated franchise agreement is commercially reasonable. *Id.* ("The good cause requirement centers on commercial reasonability.").

By 2020, ADQ required all new franchisees to sign updated franchise agreements that respond to modern technological, legal, and competitive landscapes. The 1965 Agreement is

---

[3]Because applying § 27(g) to the 1965 Agreement would not render the consent provision unenforceable, we need not address defendant's alternative arguments concerning whether retroactive application of § 27(g) implicates the Contracts Clauses of the United States and Michigan Constitutions.

inadequate and not suitable for operating a global franchise in 2025. As ADQ explains, "the 1965 Agreement did not anticipate, much less address, present-day issues surrounding brand management, marketing and sales promotion, health and sanitation, or a modern supply chain," nor did it "anticipate the internet, electronic payments, data security, or even the requirements of the MFIL." The success of a franchise is due, in part, to standardized operations. A customer walking into any Dairy Queen location worldwide expects to see the same menu, order the same item, pay relatively the same price through the same payment system, use the same rewards program, experience the same level of cleanliness and customer service, and be treated to the same upside-down Blizzard® showmanship. In sum, ADQ's desire to standardize their franchise agreements—and update their sixty-year-old agreement—is reasonable.

Plaintiffs' argument that the 1965 Agreement adequately creates brand consistency and responds to modern demands strains credulity. Standardization and uniformity concerns apply more widely than to menu items and store layout. Just because the 1965 Agreement accounts for those elements does not mean that it addresses payment technology, online ordering, rewards programs, or other technological developments. Moreover, that plaintiffs' twelve Dairy Queen locations have operated according to ADQ's standards thus far is unpersuasive: ADQ need not rely on the goodwill of new franchisees to ensure the stores operate according to modern practices. ADQ reasonably desires to enshrine its obligations and expectations in writing.

D.

In sum, ADQ had good cause for conditioning consent to transfer on prospective franchisees' execution of a new agreement. Assuming without deciding that the MFIL applies retroactively, the 1965 Agreement's consent-to-assign requirement is enforceable. Because this

provision is enforceable and ADQ had good cause, ADQ did not breach its agreement with plaintiffs and are not entitled to declaratory relief.

IV.

We affirm the district court's grant of summary judgment in favor of ADQ.